## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID SHIM | ) Case No.:2:23-cv-393 |
| Plaintiff, | ) **Jury Trial** |
| v. | ) **Demanded** |
| ALLEGHENY COUNTY, PA | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff David Shim ("Officer Shim" or "Plaintiff") by undersigned counsel, brings this complaint against Allegheny County ("Allegheny County" or "Allegheny County Sheriff's Office" or "Defendant") and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e-5(f)(1); 42 U.S.C. §1981A and 28 U.S.C. §1331; 42 U.S.C. § 2000e-2 *et seq.*

2. Moreover, this Honorable Court has jurisdiction over Plaintiff's state law claims to the extent that he pleads them pursuant to 28 U.S.C. §1367.

## THE PARTIES

3. Plaintiff, David Shim, is a citizen of the Commonwealth of Pennsylvania.

4. Defendant Allegheny County is a political subdivision of the Commonwealth of Pennsylvania with its principal address at 436 Grant Street, Pittsburgh,

1

Pennsylvania 15219. At all times relevant hereto, it was Officer Shim's employer and was an Employer, within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

## JURISDICTION AND VENUE

5. This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331 as one arising under laws of the United States. *See* 28 U.S.C. §1331.

6. Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the "unlawful employment practice[s]" giving rise to this lawsuit took place within this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. All conditions precedent to filing claims under Title VII have been performed or have occurred. Namely, Officer Shim filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commissions ("EEOC") as dual filed with the Pennsylvania Human Relations Commission ("PHRC") on December 8, 2022. Officer Shim has fully exhausted his administrative remedies as of December 12, 2022, as to his federal claims, and is entitled to file in federal district court (Exhibit A). Officer Shim will seasonably amend his pleadings to include his claims falling under the PHRC once they have been fully exhausted.

## FACTUAL BACKGROUND

8.  Officer Shim was employed as a Deputy Sheriff with the Allegheny County Sheriff's Office. His month and year of hire was July 2010.

9.  On January 9, 2022, Officer Shim filed a religious exemption from the COVID-19 vaccine with the Allegheny County Sheriff's Office (Exhibit B).

10. On January 27, 2022, Officer Shim was told that his request for religious exemption was not considered adequate and when he opposed the failure to interact in good faith about his accommodation requests, and the mistreatment based on his faith, he was told that his religious exemption was denied.

11. On February 1, 2022, Officer Shim was suspended pending termination for failure to comply with the COVID-19 Mandate Policy.

12. On February 2, 2022, Officer Shim had a Loudermill meeting.

13. On February 2, 2022, Officer Shim was discharged.

14. In September 2022, Officer Shim's union arbitration was denied.

15. On February 2, 2022, the Defendant informed Officer Shim that he was discharged for failure to comply with the COVID-19 Mandate Policy.

16. Officer Shim is a life-long Christian. He has been active in his local church, a member of the Assemblies of God.

17. Officer Shim has and had sincerely held religious objections to accepting or receiving any of the then available COVID-19 vaccines because of the

connection between the various COVID-19 vaccines and the cell lines of aborted fetuses, whether in the vaccines' origination, production, development, testing or other inputs (see Exhibit B).

18. A fundamental aspect of Officer Shims sincerely held religious beliefs is that all life is sacred from the moment of conception to natural death, and that abortion is a grave sin against God and the murder of an innocent life.

19. Officer Shim has a sincerely held religious belief that God forms children in the womb and life is sacred from the moment of conception. See Psalm 139:13-14 (KJV); Psalm 139:16 (KJV); Isaiah 44:2 (KJV); Isaiah 49:1 (KJV); Isaiah 49:5 (KJV); Jeremiah 1:5 (KJV).

20. Officer Shim also has a sincerely held religious belief that every child's life is sacred as they are made in the image of God. See Genesis 1:26-27 (KJV).

21. Officer Shim also has sincerely held religious beliefs that because life is sacred from the moment of conception, the killing of that innocent life is the murder of an innocent human in violation of God's laws. See Exodus 20:13 (KJV); Exodus 21:22-23 (KJV); Exodus 23:7 (KJV); Genesis 9:6 (KJV).

22. Officer Shim also sincerely holds the religious belief that it would be better to tie a millstone around his neck and drown in the sea than to bring harm to an innocent child. See Matthew, 18:6 (KJV); Luke, 17:2 (KJV).

23. Officer Shim has sincerely held religious beliefs, rooted in the Scriptures

listed above, that anything that condones, supports, justifies, or benefits from the taking of innocent human life *via* abortion or use of the cell lines of aborted babies is sinful, contrary to the Scripture, and must be denounced, condemned, and avoided all together at the risk of eternal damnation.

24.  Officer Shim has sincerely held religious beliefs, rooted in the Scriptures as more fully listed above, that it is an affront to Scripture's teaching that all life is sacred when any believer uses a product derived from or connected in any way with abortion.

25. Officer Shim sincerely held religious beliefs, rooted in the above Scriptures, preclude him from accepting any one of the then available Covid-19 vaccines derived from, produced, or manufactured by, tested on, developed with, or otherwise connected to aborted fetal cell lines.

26.  Officer Shim had sincerely held religious objections to the Moderna and Pfizer/BioNTech COVID-19 vaccines because both of these vaccines have their origins in research on aborted fetal cells lines. See Vogel, Annett B. Et. Al, A Perfusion Sars-CoV-2 Spike RNA vaccine...Biorxiv.org, https://doi.org/10.1101/2020.09.08.280818; Corbett, K.S. et. al. SARS-CoV-2mRNA vaccine design enabled by prototype pathogen preparedness...Nature 586, 567-571 (2020) https://doi.org/10.1038/s41586-020-2622-0.

27. Further, as reported by the North Dakota Department of Health, in its handout

literature for those considering one of the COVID-19 vaccines, the Moderna and Pfizer mRNA vaccines are ultimately derived from research and testing on aborted fetal cell lines.

28. In fact, "[e]arly in the development of mRNA vaccine technology, fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARSCoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein." See North Dakota Health, COVID-19Vaccines & Fetal Cell Lines (Nov. 19, 2021).

29. Once more, Louisiana Department of Health publications confirm that aborted fetal cells lines were used in the "proof of concept' phase of the development of the COVID-19 mRNA vaccines. Louisiana Department of Public Health, You Have Questions, We Have Answers: COVID-19-Vaccine FAQ (Dec. 12, 2020), available at https://ldh.la.gov/assets/oph/Center PHCH/CentérPH/immunizations/YouHave_Qs_COVID-19 Vaccine_FAQ.pdf.

30. Furthermore, Officer Shim had sincerely held religious objections to the Johnson & Johnson (Janssen Pharmaceuticals) vaccine because it unquestionably used aborted fetal cells lines to produce and manufacture the vaccine. Janssen Pharmaceuticals. Our Innovative Vaccine Technology Platforms–ADVAC and Per.C6. Http://janssen.com/emea/emea/janssen-

vaccine-technologies.

31. As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[One non-replicating viral vector vaccine produced by Johnson & Johnson did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine." See North Dakota Health, COVID-19 Vaccines & Fetal Cell LinesApril202), available at https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine %20Page/COVID-19_Vaccine_Fetal_Cell Handout.pdf; The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine, which used the PER.C6 fetal cell line, "is a retinal cell line that was isolated from a terminated fetus in 1985." Louisiana Department of Public Health, You Have Questions, We Have Answers: CDVID-19 Vaccine FAQ (Dec. 12, 2020), https://ldh.la.gov/assets/oph/Center PHCH/CenterPH/Immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf.

32. Additionally, Scientists at the American Association for the Advancement of Science have likewise published research showing the Johnson & Johnson vaccine used aborted fetal cell lines in the development and production phases of the vaccine. Meredith Wadman, Vaccines that use human fetal cells draw

fire,        Science        (June        12,        2020),        available

https://science.sciencemag.org/content/368/6496/1.

33. Thus, because all three of the then-available COV1D-19 vaccines were developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines HEK-293 and PER.C6, Officer Shim's sincerely held religious beliefs compelled him to abstain from obtaining or injecting any of these products into his body, regardless of the perceived benefit or rationale.

34. Once more, Officer Shim had a sincerely held religious belief that his body is a temple of the Holy Spirit, and that to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the temple of the Holy Spirit. See 1 Corinthians 6:15-20 (KJV).

35. On or about January 9, 2022, Officer Shim informed Defendant that his religious beliefs prevent him from receiving the available COVID-19 vaccines because they all employ cell lines derived from aborted children, and his beliefs compel him to abstain from any cooperation, direct or indirect, in abortion, which he viewed as the killing of innocent lives. However, Officer Shim expressed his willingness to wear a mask and/or be routinely tested which is a better indicator of virus and that this be approved as a reasonable accommodation to receiving the Covid-19 vaccine.

36. The aforesaid accommodations were reasonable because, *inter alia*, Defendant itself had adopted those accommodations in an August 6, 2021, mandate from the Allegheny County Manager's Office that, in relevant part, provided: Effective Monday, August 9, 2021, all Allegheny County employees must get a Covid-19 vaccination, *or* be subject to a mask requirement and regular Covid-19 testing (August 6, 2021 Memo from Allegheny County Manager Office to Allegheny County employees)(emphasis added). Defendant's policy required that all employees be vaccinated for COVID-19 on or before December 1, 2021.

37. The aforesaid accommodations likewise were reasonable because, *inter alia*, Defendant's Health Department on October 26, 2021, announced options if an employee is not fully vaccinated, the following alternative is available: Unvaccinated employees are required to continue following all appropriate mitigation measures while in the workplace, including wearing face coverings...and staying physically distanced by at least 6 feet. (October 26, 2021, Memo from Christopher Cavendish, Human Resources Manager).

38. Despite Officer Shim's request for accommodation of his sincerely held religious belief, Defendant refused to accommodate Officer Shim.

39. Critically, Defendant did not offer any alternative accommodation to Officer Shim's requests other than suspension and discharge.

40. Rather, on February 2, 2022, Defendant simply fired Officer Shim for "failing to comply with Defendant's Covid-19 vaccination requirement."

41. Defendant claims it relies on the argument that it would be a "significant undue hardship" to continue allowing unvaccinated employees, like Officer Shim to continue working for the Defendant—an unsupportable claim. Setting aside the fact that the overwhelming majority of U.S. based companies managed to navigate the COVID-19 pandemic without instituting a vaccination mandate, there were a multitude of no-cost accommodation options available in Officer Shim's specific case. Thus, Officer Shim could have continued being accommodated, given the testing, and/or masking and distancing that the Defendant had already agreed to.

42. Although Defendant admits that weekly testing for COVID was an option as of August 6, 2021, it never discussed the continuance of masking and/or weekly testing or its costs with Officer Shim.

43. Defendant' repeatedly asserted throughout the relevant timeframes, through word and action, that the available COVID-19 vaccines were effective at preventing transmission of the virus and that the Policy was necessary to ensure workplace safety. While absolute vaccine necessity was always a dubious proposition, the inefficacy of the vaccines at preventing the contraction and transmission of COVID-19 became increasingly clear in

October and November of 2021 as the Omicron variant became dominant. Nonetheless, Defendant terminated Plaintiff in February 2022.

44. In fact, even after vaccination rates went up at the Allegheny County Sheriff's Office, there were multiple reports of breakthrough infections with many officers and employees needing to take medical leave due to the virus. Thus, upon information and belief, Defendant' own records will demonstrate that Defendant was aware of the fact that the mandated vaccines were not effective at stopping transmission of the virus during the relevant timeframes.

45. Any reasonable person viewing these facts would deduce Defendant simply intended to undermine Officer Shim's religious beliefs and that Defendant's grounds for terminating Officer Shim was pretextual.

46. The EEOC Guidelines have made clear that "when there is more than one means of accommodation which would not cause undue hardship"—which existed in Officer Shim's case— "the employer . . . must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities." *See EEOC Commission Guidelines*, 29 C.F.R. § 1605.2(c)(2)(ii).

## REASONABLE ACCOMODATION OPTIONS UNJUSTIFIABLY REJECTED BY DEFENDANT

47. Defendant could have continued accommodating Officer Shim's sincerely held religious beliefs without undue hardship (indeed, with no cost

whatsoever, if Officer Shim paid for testing, for example). Defendant failed to engage in the interactive process to legitimately consider all possible accommodations. This caused Defendant to overlook accommodations posing less than a *de minimis* burden including: (1) testing for COVID antibodies and acknowledging that Officer Shim's natural immunity satisfied the Defendant's immunization requirements (because it is superior to vaccine-induced immunity); (2) weekly testing for COVID-19 (for which Officer Shim had been doing and for which Officer Shim would have entertained paying for, if necessary, and which is a far more reliable indication of safety than vaccination); (3) testing/masking when required to attend an in-person meetings; or (4) any combination of the above.

48. At the time of Officer Shim's termination, the CDC had conclusively stated that individuals vaccinated for COVID-19 could nevertheless contract and spread COVID-19. On March 29, 2021, the Director of the CDC Rochelle Walensky publicly stated that the CDC's own data "suggests, you know, that vaccinated people do not carry the virus, don't get sick, and that it's not just in the clinical trials but it's also in real world data."[1]

---

[1] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Rachel Maddow Show (March 29, 2021), transcript available at: https://www.msnbc.com/transcripts/transcript-rachel-maddow-show-3-29-21-n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_campaign=Buffer.

49. However, because the real-world data already demonstrated breakthrough infections in the vaccinated just three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others. *See* CDC Reverses Statement by Director, (April 2, 2021), available at: https://thehill.com/changingamerica/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

50. Before instituting its vaccination policy, Defendant knew or reasonably should have known that the vaccines were largely ineffective at controlling the spread of COVID-19. As early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[2]

51. In Fact, in August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission. The study indicated that vaccinated individuals had a 5% higher viral load than the

---

[2] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), available at https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARSCoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

unvaccinated and were not only just as likely to transmit the virus as the unvaccinated but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[3]

52. Highlighting the irrationality of Defendant's continued pursuit of enforcing its mandate against religious employees, Defendant also refused to recognize natural immunity as satisfying its immunization requirement. This is despite the fact that the international scientific community had conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity. *See Plotkin's Vaccines*, 7th Edition, at Section 2.

53. Defendant is a sophisticated governmental agency which focuses on public services and should have been aware of the fallacy of enforcing its vaccination Policy in the context of undue hardship and failed to even consider the religious beliefs of Officer Shim when determining whether it could exempt him.

54. Recognizing Officer Shim's natural immunity to COVID-19 as an alternative to vaccination would have required no cost or action of the Defendant and would have imposed no logistical or administrative burden on the Defendant.

---

[3] *See* Kasen Riemersma, et. al, *Shedding of Infectious SARS-CoV-2 Despite Vaccination, medRxiv* (August 24, 2021), available at: https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

It would have simply required that the Defendant acknowledge scientific reality which had already been done by the CDC.

55. Alternatively, continued periodic COVID-19 testing (which, again, was already accommodated) would have been a costless accommodation. As the CDC recognized in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[4]

56. Because vaccinated individuals may also contract and transmit COVID-19, a negative COVID-19 test is a more reliable indication of safety from the virus than a vaccination at some earlier time. This fact was also well-known at the time Defendant suspended Officer Shim's denying his accommodation and should have been considered as a reasonable accommodation to the vaccine mandate.

57. Having Officer Shim wear a mask when he would have needed to meet someone in person (which was done from the inception of mask wearing post Pandemic and prior to vaccines) was another possible reasonable accommodation. As even medical and pharmaceutical companies have shown—including vaccine manufacturer Janssen (J&J)—that religiously

---

[4] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021), available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

exempt employees may be accommodated without increased risk, or cost through testing and masking.

## **APPLICABLE LAW**

58. Title VII prohibits Defendant from discriminating against employees based on their religion. 42 U.S.C. § 2000e-2(a)(1). This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

59. In other words, an employer must "make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

60. This allows a plaintiff to raise claims of religious discrimination under both a disparate treatment theory and a failure-to-accommodate theory. *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

61. Failure to engage the interactive process to find a solution for an exempt employee "is not an independent violation of Title VII. But as a practical matter, such failure can have adverse legal consequences [because] where an employer has made no effort to act on an accommodation request, courts have

found that the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation (or proposed continued accommodation) would actually have posed an undue hardship." EEOC Guidance, *Section 12: Religious Discrimination*, Part 12-IV.A.2 (citing *EEOC v. Ithaca Indus., Inc*., 849 F.2d 116, 118-19 (4th Cir. 1988) (finding that employer's failure to attempt to accommodate, absent any showing of undue hardship, violated Title VII)); *see also EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue . . . any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate (or continue accommodating) reasonably [plaintiff's] religious needs without undue hardship on the conduct on its business.").

62. Title VII also prohibits Defendant from retaliating against an employee for engaging in protected activity. *Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 571 (3d Cir. 2002) *see also*, *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006) *Ferra v. Potter*, 324 F. App'x 189, 192 (3d Cir. 2009) ("As this Court has explained, '[w]ith respect to `protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and ***those who oppose*** discrimination made un-lawful by Title VII. . . .'").

**CLAIM FOR RELIEF**
**TITLE VII – RELIGIOUS DISCRIMINATION**
**FAILURE TO ACCOMMODATE**
42 U.S.C. §§2000e-(j), and 2000e-2(a)(1)

63. Plaintiff incorporates herein by reference each and every allegation in the preceding paragraphs of this complaint.

64. An employee may assert a claim, for his employer's failure to accommodate, or continue accommodating an existing accommodation, of his sincere religious beliefs, so long as the accommodation does not impose undue hardship on the employer. *See Storey v. Burns Intern. Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004) ("An employer's failure to reasonably accommodate an employee's sincerely held religious belief that conflicts with a job requirement can also amount to an adverse employment action unless the employer can demonstrate that such an accommodation would result in 'undue hardship.'").

65. To establish a prima facie claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Wilkerson v. New Media,* 522 F.3d 315, 319 (3d Cir. 2008) ("To establish a prima facie case of a failure to accommodate claim, the employee must show: (1) she has a sincere religious

belief that conflicts with a job requirement; (2) she told the employer about the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement.") (*Quoting Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

66. Once the plaintiff has made out a prima facie case for discrimination, "the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Groff v. Dejoy,* 35 F.4th 162, 169 (3d Cir. 2022).

67. Officer Shim clearly established his "bona fide religious belief" and its conflict with the Defendant's Policy when he submitted his religious accommodation request to Defendant. Because Officer Shim could not receive the COVID-19 vaccine without violating his religious beliefs, he could not comply with the Policy and was thus subject to adverse action through both suspension and termination. While Defendant may now attempt to challenge Officer Shim's beliefs, it is not the employer's place to question or interpret an employee's religious beliefs, *Equal Employment Opportunity Commission v. Geo Group, Inc.,* 616 F.3d 265, 291 (3d Cir. 2010) ("An employer is not entitled to interpret the employee's religion and determine what is and is not religiously acceptable to them.").

68. Defendant provided a reasonable accommodation to unvaccinated employees as an option in August 2021 but one which was only temporary, and furthermore then chose to chill the employee's faith-based requests by telling him he would be terminated based on a deadline if he was not in compliance. Thereafter, it suspended and terminated Officer Shim without engaging further in any interactive process to attempt to find a workable continuing accommodation that would not pose an undue hardship to the sheriff's office. Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

69. To establish the defense of "undue hardship," Defendant must demonstrate that any of the aforesaid accommodations would "bear more than a *de minimis* cost" on the company. *Hardison*, 432 U.S. at 84. The above stated accommodations required no additional cost or logistical burden to Defendant, as was seen when the Defendant accommodated numerous employees from around the county who were unvaccinated. Defendant also provided an accommodation, albeit temporary. How then was it an undue hardship to continue accommodating what it had already accommodated.

70. The ability to provide reasonable accommodations to employees such as Officer Shim is also evident by considering other companies including countless hospitals and even COVID-19 vaccine manufacturers such as Janssen (J&J)—that were able to accommodate employees with religious based objections to mandatory COVID-19 vaccination policies.

71. Defendant is thus without excuse as to why it failed also to follow federal employment law in this regard.

72. Title VII requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials. "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[5]

73. Such accommodations might include things such as masking and testing. In the face of the reasonable options proposed here, Defendant cannot demonstrate even a *de minimis* burden in providing Officer Shim with an accommodation that had, for all practical purposes, provided an alternative to vaccines for months before his termination.

74. To be sure, testing was a reasonable accommodation even for people physically entering the workplace—it is undisputed that someone cannot

---

[5] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

catch COVID-19 from someone who does not have COVID-19. And to the extent that Officer Shim would need to be in contact with other employees or the public as the case may be, a negative COVID-19 test would have confirmed that he was less of a contagion hazard than untested individuals who were vaccinated at some earlier point in time but who could still contract and transmit COVID-19.

75. In denying Officer Shim's request, Defendant blankly asserted "significant undue hardship" and provided no justification as to why or how the several options he proposed (and were clearly available as it had so accommodated him and others from August 2021) were unable to be done without undue hardship. This is especially true where recognition of Officer Shim's natural immunity and/or continued testing (for example) required little cost, effort, or operational change to the status quo.

76. Moreover, Defendant was on actual of notice, both, of the many possible accommodation options for Officer Shim (as it had provided some as previously mentioned) and the fact that the failure to continue using one or more of them would result in a Title VII violation. Nonetheless, Defendant forged forward with its campaign to eliminate its religious employees, including Officer Shim.

77. Therefore, Defendant unlawfully discriminated against Officer Shim based on his sincerely held beliefs by failing to accommodate and/or continuing to accommodate those beliefs. Defendant cannot demonstrate that doing so would have imposed any hardship whatsoever, let alone undue hardship.

78. As a direct result of Defendant's violation of Title VII, Officer Shim has lost wages and other economic benefits of his employment with Defendant, in addition to suffering emotional distress, depression, inconvenience and humiliation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

(a)     That the Court enter a judgment declaring Defendant's actions to be unlawful and in violation of Title VII of the Civil Rights Act;

(b)     That Defendant be ordered to reinstate Plaintiff and provide him accumulated seniority, fringe benefits and all other rights;

(c)     That Defendant be required to compensate Plaintiff for the full value of wages he would have received had it not been for Defendant's illegal treatment of Plaintiff, with interest from the date of discrimination, in addition to reimbursement for lost pension, experience, training opportunities and other benefits;

(d)      That the Court award Plaintiff compensatory damages such as pain, suffering, inconvenience, humiliation and reputational losses as a result of Defendant's violations of Title VII of the Civil Rights Act;

(e)      That Defendant be enjoined from discriminating against Plaintiff in any manner that violates Title VII of the Civil Rights Act;

(f)      That Plaintiff be awarded against Defendant the costs and expenses of this litigation and reasonable attorneys' fees; and

(g)      That the Court grant Officer Shim additional relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demands trial by jury on all counts so triable.

DATED this the 9th day of March 2023.

By: /s/ *Jeremy A. Donham, Esquire*
Jeremy Donham, (206980)
**DONHAM LAW**
714 Venture Drive, Ste. 144
Morgantown, West Virginia 26508
717.881.7855 (phone)
J.Donham@Donhamlaw.com

Charles J. Hobbs (209321)
(Pro Hac Vice Pending)
**THE HOBBS LAW FIRM**
256 E. Market Street
York, PA 17403
(717) 793-2398 (Phone)
Email: chobbs@thehobbslawfirm.com